J-S55030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER DARNELL YOUNG | : | |
| | : | |
| | : | No. 546 WDA 2020 |

Appeal from the Judgment of Sentence Entered January 16, 2020
In the Court of Common Pleas of Cambria County Criminal Division at
No(s):  CP-11-CR-0000572-2018

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED: MARCH 16, 2021**

Christopher Darnell Young (Appellant) appeals from the judgment of sentence entered in the Cambria County Court of Common Pleas, following his jury convictions of involuntary deviate sexual intercourse (person unconscious), sexual assault, aggravated indecent assault, and indecent assault.[1]  Appellant raises three issues challenging the sufficiency of the evidence, the weight of the evidence, and the discretionary aspects of sentencing.  We affirm.

C.P. (Victim) testified at trial to the following.  On January 14, 2017, Victim went to Dively's bar in Roxbury, Pennsylvania with friends.  N.T. 10/7/19, at 45.  While there, she drank one beer.  *Id.* at 46.  Later that

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3123(a)(3), 3124.1, 3125(a)(4), 3126(a)(4).

evening, she received a text message from Bobby Comiskey (Comiskey) to "come up" to Woodside Bar and Grill (Woodside). *Id.* Comiskey was at Woodside with Appellant. *Id.* at 46-47. Victim used Facebook Messenger to ask Appellant if he would drive her home that night to which he responded yes. *Id.* at 47-48. This was the first time Victim had ever communicated with Appellant. *Id.* at 47. Victim arrived at Woodside approximately at midnight, sober and with no physical injuries, bruising, marks, or soreness. *See id.* at 48, 50-51. Appellant bought Victim a total of three drinks, handing each to her. *Id.* at 50-53. After the first two drinks, Victim "felt fine." *Id.* at 51-52. Victim stated Appellant then "got kind of aggressive" by "trying to push a shot off on [her]." *Id.* at 52. Victim declined the shot and Appellant told her "you're going to have another drink." *Id.* Appellant got Victim her third drink, which she told Appellant "tasted really off, kind of strong," and "just different" and unlike "the other two." *Id.* at 52-53. Victim recounted that she then stood to use the restroom when:

> [T]he room started spinning. And I remember . . . I couldn't keep my balance and I was . . . bouncing off the walls and the sink. And I remember people in the restroom asking me if I was okay, but I was kind of starting to . . . lose my consciousness, so I just kind of brushed it off. I didn't realize something was wrong with me. And, then, from that point, I remember walking back to the bar and, then, that's when I totally lost my memory.

*Id.*

Victim testified the next thing she remembered was waking up at "what [she] assumed was" Appellant's house. N.T. 10/7/19, at 54. She testified that although she regained consciousness, she was "still . . . really out of it,"

and awoke to Appellant "laying" on her. *Id.* Victim stated her pants and underwear were "around [her] ankles." *Id.* at 55. Appellant's head was in her vaginal area. *Id.* at 54. Victim then remembers crying and yelling at Appellant to take her home. *Id.* She still "didn't realize what had happened." *Id.* Appellant told Victim to "stop crying; that it wasn't that big of a deal." *Id.* At this point, the Victim again "blacked out." *Id.* Victim did not remember how she arrived home, but woke up in her bed at 10:00 in the morning. *Id.* at 56. Victim took a shower but was "still [ ] not really aware of what happened." *Id.* During the shower, she discovered "all of [her] injuries." *Id.* Victim testified:

> I had bruising all over my body. My body was very sore. I had vaginal injuries. I couldn't even thoroughly shower. I was extremely swollen and tore up [in my vaginal area].

*Id.* at 57.

Victim then called her mother to tell her about the incident. N.T. 10/7/19, at 57. She bagged up the clothes she wore to Woodside and her mother took her to the hospital to be examined. *Id.* After the hospital, the Victim went to Stoneycreek Police Department where she spoke to Police Sergeant David Pollino and gave him a written statement. *Id.* at 58-59. Victim stated that before January 14, 2017, she never blacked out or lost her memory like that in her life. *Id.* at 60.

Appellant testified in his own defense at trial. Appellant stated he initiated contact with Victim on Facebook Messenger, N.T. 10/8/19, at 7, to "let her know that [Appellant] and [Comiskey] would be out that evening. . .

[a]nd [Victim] said that she would message her friend to see if they want to meet up with [Appellant and Comiskey]." *Id.* at 8-9. Appellant stated he bought Victim "two or three" drinks on January 14, 2017, *id.* at 10, but that other "various" people also bought Victim drinks throughout the night. Appellant explained that these "various" other people were not seen on the surveillance video from Woodside because the video was from "towards the end of the night[.]" *Id.* at 48. Appellant, Comiskey, and Victim left Woodside together at approximately "2:20 [or] 2:30[ ]" in the morning. *Id.* at 14. Appellant took Comiskey home then tried to take Victim home, but she was asleep and could not tell Appellant her address. *See id.* at 15-17. Appellant then asked Victim if she "wanted to snuggle up on [his] couch . . . [and s]he shook her head yeah." *Id.* at 18.

After arriving at Appellant's home, Victim began to stumble causing Appellant to stumble and fall with her. N.T. 10/8/19, at 25-26. Appellant claimed he hit his head, elbow, and both knees when he fell. *Id.* at 27. Appellant claims his health issues require the use of a "concentrator," to produce oxygen. *Id.* at 29. After they fell, Appellant was "out of breath" and started to use the concentrator on the floor of his living room, *id.* at 28-30, while Victim remained on the floor where she fell. *Id.* at 30. "At some point," Victim moved to Appellant's couch, *id.* at 30-31, while Appellant remained on the floor. *Id.* at 32. Around 3:35 in the morning, Appellant noticed Victim had her pants down, but he could not "see [Victim's] vagina." *Id.* at 32-34. Appellant stated Victim's pants were not "all the way down[ ]" because the

- 4 -

Victim was wearing "knee-high boots with her pants tucked inside of them[.]" *Id.* at 34-35. Appellant stated Victim was touching herself. *Id.* at 34. Appellant told her to stop and "get her hands out of her pants." *Id.* at 36. Victim then "swiped" her hand and hit Appellant's mouth. *Id.* Appellant took Victim home "about ten till 4:00" in the morning after she "finally" told Appellant where she lived. *Id.* at 40.

Appellant denied having his head "in [Victim's] vaginal area[,]" stating that would be "impossible [because] she had high boots on." N.T. 10/8/19, at 44. Appellant was interviewed by Sergeant Pollino on January 15, 2017, and told Sergeant Pollino he had additional Facebook and text messages with Victim. *Id.* at 51. Appellant also stated he told Sergeant Pollino he had a "knot on his head" and bruises from falling on January 14, 2017. **Id.** at 63.

Sergeant Pollino testified at trial that he recovered surveillance footage from Woodside of Appellant and Victim from January 14, 2017. N.T. 10/7/19, at 36. In the footage, Appellant can be seen buying Victim three drinks from the bar and handing them to her throughout the night. *See id.* at 37-39. Appellant, however, told Sergeant Pollino, that Victim had five to seven drinks throughout the night. N.T. 10/8/19, at 81. Sergeant Pollino stated the surveillance footage showed Victim and Appellant from the time they arrived until they left, aside from two brief periods where Victim was presumed to have gone to the bathroom and returned on screen with no drinks. *Id.* at 84. There was no evidence Victim ordered or was bought any drinks other than the ones provided by Appellant. *Id.* at 89. After her third drink, Victim left

view of the camera momentarily and then re-entered the frame. N.T. 10/7/19, at 39. She then vomited multiple times and fell approximately seven times before leaving the bar and getting into Appellant's car. *Id.* at 39-42.

Sergeant Pollino testified that, during his interview with Appellant on January 15, 2017, Appellant did not inform him of or show him any other text or Facebook messages he exchanged with Victim aside from the brief conversation Victim initiated asking for a ride home on January 14, 2017. N.T. 10/8/19, at 85. Sergeant Pollino testified that Victim was wearing ankle boots on January 14, 2017, as seen in surveillance footage. *Id.* The sergeant stated Appellant did not tell him he "smacked his head or was injured[.]" *Id.* at 87. However, he acknowledged Appellant told him there was "no possible way" for his DNA to be on the Victim because "[Appellant] didn't touch her." N.T. 10/7/19, at 126.

The Commonwealth presented two expert witnesses. Doctor Roger Taylor (Dr. Taylor), an expert in the field of medicine, testified the Victim's labia majora had "pretty significant swelling[.]" N.T. 10/7/19, at 101. Dr. Taylor opined that "in the broadest sense" the vaginal swelling and abrasion on Victim could be caused by masturbation if it was "vigorous or aggressive or prolonged[.]" *Id.* at 111-12. Dr. Taylor also stated it was possible for "[s]oaps, detergents, [or] perfumes" to cause "vaginal swelling[,]" but such an occurrence was "rare." *Id.* at 112.

The Commonwealth also presented Brittni Andaloro (Andaloro), an expert in "forensic DNA analysis[.]" N.T. 10/7/19, at 153. Andaloro testified

that two samples she received from Victim, a vaginal swab and rectal swab, had enough male DNA to test. *Id.* at 160-61. She stated Appellant's DNA sample "matche[d]" DNA found in Victim's vaginal swab, meaning neither Appellant "nor any of his paternally male relatives [could] be excluded as a contributor to this DNA[.]" *Id.* at 162-64. The matching DNA was "potentially from skin cells or [ ] saliva cells[ ]" and would have gotten into the vaginal cavity "from some sort of contact [or] penetration[.]" *Id.* at 165. Further, Andaloro testified that it was "possible" but not "very likely" that this DNA got there by Victim touching herself. *Id.* Andaloro stated "based on the amount of DNA that was there, [she] would think that this DNA [was] more consistent with a direct transfer or direct contact as opposed to [a] multistep[2] transfer event[.]" *Id.* at 166.

On May 24, 2018, Appellant was charged with the aforementioned crimes. The case proceeded to a jury trial commencing on October 7, 2019. On October 8th, the jury convicted Appellant on all counts. On January 16, 2020, the trial court sentenced Appellant to an aggregate period of 48 to 120 months' imprisonment.[3] N.T., 1/16/20, at 23. In addition, the court informed

---

[2] Andaloro described a "multistep transfer" as Victim "touch[ing] something else in order to then transfer" by touching herself; it would not have been from "direct contact." N.T. 10/7/19, at 174.

[3] Specifically, the court imposed the following sentences: (1) involuntary deviate sexual intercourse, a term of 48 to 120 months' incarceration; (2) sexual assault, 36 to 72 months' incarceration; (3) aggravated indecent assault, 36 to 72 months' incarceration; and (4) indecent assault, 9 to 60

Appellant that he was required to register with the Pennsylvania State Police

"for the remainder of his life" as a sexual offender pursuant to "Megan's Law."[4]

*Id.* at 27-28.

Appellant filed a timely post-sentence motion, which the trial court

denied on April 20, 2020.  Appellant filed this timely appeal and complied with

the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of

on appeal.

> Appellant presents the following three issues for our review:
>
> 1. Whether the [t]rial [c]ourt erred in denying [ ] Appellant's [p]ost[-s]entence [m]otion for [j]udgment of [a]cquittal given that the evidence adduced at trial failed to prove [ ] Appellant's guilt beyond a reasonable doubt as to the charges of [i]nvoluntary [d]eviate [s]exual [i]ntercourse, [s]exual [a]ssault, [a]ggravated [i]ndecent [a]ssault, and [i]ndecent [a]ssault?
>
> 2. Whether the [t]rial [c]ourt erred and abused its discretion in denying [ ] Appellant's [p]ost[-s]entence [m]otion for a new trial given that the verdict of the jury on the counts of [i]nvoluntary [d]eviate [s]exual [i]ntercourse, [s]exual [a]ssault, [a]ggravated [i]ndecent [a]ssault, and [i]ndecent [a]ssault was against the

---

months' incarceration.  **See** N.T. Sentencing, at 21-23.  The court directed that all sentences run concurrently to each other.  **Id.**

[4]  Although the Sexual Offender's Registration and Notification Act (SORNA) replaced Megan's Law in 2012, the trial court referred to the registration statute as Megan's Law. **See Commonwealth v. Asher**, ___ A.3d ___, ___, 2020 WL 7487519 at * 1 n.5 (Pa. Super. Dec. 21, 2020) (SORNA replaced Megan's Law in 2012; SORNA II enacted in 2018).  Nonetheless, the trial court properly informed Appellant that he is subject to lifetime registration as a Tier III sexual offender.  **See** 42 Pa.C.S. §§ 9799.14(d)(4) ,(5), (7); 9799.15(a)(3).

weight of the evidence, based in part, on the inconsistent statements of the alleged victim?

3. Whether the [s]entencing [c]ourt abused its discretion in sentencing [ ] Appellant to a total term of incarceration of 48 to 120 months, specifically that the sentence was excessive because the [s]entencing [c]ourt ignored mitigating factors, including [ ] Appellant's poor health which requires him to attend frequent doctor['s] appointments and to undergo dialysis?

Appellant's Amended Brief at 8 (unpaginated).[5]

Appellant first argues the trial court erred in denying his post-sentence motion because the Commonwealth did not present sufficient evidence to prove his guilt beyond a reasonable doubt for any of his four convictions. Appellant's Amended Brief at 15. Appellant asserts there were inconsistencies in Victim's statement to police and preliminary hearing testimony. *Id.* at 16. He contends that Victim's testimony concerning the "overly strong" drink, "that her pants and underwear were both off, and that [A]ppellant's head was in her vaginal area[,]" were mentioned for the first time during the trial. *Id.* Appellant maintains Victim had prior opportunities to disclose this information, but did not. *Id.* He states that due to these inconsistencies, this evidence was "insufficient" for a jury to find him guilty. *Id.* at 16-17.

The Pennsylvania Supreme Court has held:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged

---

[5] Appellant's original brief did not include the requisite statement of reasons relied upon for allowance of appeal with respect to his challenge to the discretionary aspects of his sentence. *See* Pa.R.A.P. 2119(f). After the Commonwealth objected to this omission, Appellant requested permission to file an amended brief, which this Court granted. *See* Order, 11/4/20.

and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (citations omitted). Further, this Court has explained:

Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

The offenses of involuntary deviate sexual intercourse (person unconscious), sexual assault, aggravated indecent assault, and indecent assault, in their relevant portions, are defined as follows:

**Involuntary deviate sexual intercourse.**

**(a) Offense defined.--**A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant:

\* \* \*

(3) who is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring[.]

18 Pa.C.S. § 3123(a)(3).

**Sexual assault.**

- 10 -

Except as provided in section 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

18 Pa.C.S. § 3124.1.

**Aggravated indecent assault.**

**(a) Offenses defined.--**Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:

\* \* \*

(4) the complainant is unconscious or the person knows that the complainant is unaware that the penetration is occurring[.]

18 Pa.C.S. § 3125(a)(4).

**Indecent assault.**

**(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

\* \* \*

(4) the complainant is unconscious or the person knows that the complainant is unaware that the indecent contact is occurring[.]

18 Pa.C.S. § 3126(a)(4).

- 11 -

Upon our review of the record, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we agree with the conclusion of the trial court that the evidence was sufficient to support a guilty verdict. Victim's testimony supported each of the crimes for which Appellant was convicted. Appellant bought Victim three drinks on January 14, 2017. N.T. 10/7/19, at 50-53. Victim stated the third drink tasted "off." *Id.* at 52-53. She then lost consciousness and briefly woke up with Appellant's head in her vaginal area. *Id.* at 53-54. The next day, Victim had bruising, soreness, and vaginal injuries. *Id.* at 57. With regard to the inconsistencies, the trial court noted "[Appellant's] Counsel had the opportunity and did subject the [V]ictim to cross-examination concerning any inconsistencies[.]" Trial Ct. Op. at 9. The jury was free to believe Victim's account of January 14, 2017, which it did. *See Commonwealth v. Tarrach*, 42 A.3d 342, 345 (Pa. Super. 2012) (stating "the fact-finder is free to believe all, part, or none of the evidence presented[ ]" in regards to a sufficiency claim). Additionally, the testimony of Victim alone was sufficient to sustain the verdict. *See Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006) (stating "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses") (citation omitted). Furthermore, here, the Commonwealth presented scientific evidence to support Victim's account. *See* N.T. 10/7/19 at 111-12 (Victim's labia majora had "significant swelling"), 162-66 (Appellant's DNA matched DNA from Victim's vaginal swab). Accordingly, we agree with the

- 12 -

conclusion of the trial court that the Commonwealth "presented sufficient evidence" to support a guilty verdict. *See* Trial Ct. Op. at 9. Further, we conclude the evidence was not "in contradiction to the physical facts, in contravention to human experience and the laws of nature[.]" *See Widmer*, 744 A.2d at 751. As such, the evidence cannot be "insufficient as a matter of law." *See id.* Thus, no relief is due on this claim.

In his second issue, Appellant argues the trial court abused its discretion when it denied his post-sentence motions because the jury's verdict was against the weight of the evidence. Appellant's Amended Brief at 17. Appellant insists the "inconsistent testimony" from the victim was "so contrary to the evidence as to shock one's sense of justice[.]" *Id.* (emphasis omitted). He contends the inconsistent testimony went beyond a "conflict in testimony" and "created a deficiency in evidence[.]" *Id.* Appellant asserts this deficiency was enough to warrant the grant of a new trial. *Id.* at 18.

The Supreme Court has stated:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003) (citations

omitted).

> A new trial should not be granted because of a mere conflict in the testimony. . . Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

***Widmer***, 744 A.2d at 752 (citations omitted).

Although Appellant contends the inconsistencies in Victim's testimony

went beyond a "conflict in testimony" and "created a deficiency in evidence[,]"

he does not explain why. ***See*** Appellant's Amended Brief at 17. In the instant

case, the jury was "free to believe all, part, or none of the evidence and to

determine the credibility of the witnesses." ***See Champney***, 832 A.2d at 408.

The jury believes Victim's account and found the Commonwealth's witnesses

credible. Appellant fails to explain why "certain facts are so clearly of greater

weight that to ignore them or to give them equal weight with all the facts is

to deny justice." ***See Widmer***, 744 A.2d at 752. Moreover, Appellant offers

no explanation to support the conclusion that the trial court abused its

discretion in concluding the verdict was not contrary to the weight of the

evidence. ***See Champney***, 832 A.2d at 408. Because we detect no abuse of

discretion on the part of the trial court, Appellant is entitled to no relief.

Appellant's final issue raised for review is a challenge to the

discretionary aspects of his sentence. It is well established that such a

challenge does not entitle an appellant to "review as of right."

***Commonwealth v. Caldwell***, 117 A.3d 763, 768 (Pa. Super. 2015) (*en banc*).  Rather,

> [b]efore this Court can address such a discretionary challenge, an appellant must comply with the following requirements:
>
>> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Id.*** (citation omitted).

In the present case, Appellant filed a timely notice of appeal and preserved his claims in a timely filed post-sentence motion.  ***See*** Appellant's Post-Sentence Motion, 1/23/20, at 1-2 (unpaginated).  In addition, he has included in his amended brief the requisite concise statement of reasons relied upon for appeal pursuant to Pa.R.A.P. 2119(f).[6]  ***See*** Appellant's Amended Brief at 13-14.  Accordingly, we must now consider whether Appellant's claims raise a substantial question.

An appellant "presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the sentencing

---

[6] As noted ***supra***, Appellant's original brief lacked a 2119(f) statement.  After the Commonwealth objected to this omission, Appellant requested permission to file an amended brief, which this Court granted. ***See*** Pa.R.A.P. 2119(f); Order, 11/4/20.

code or is contrary to the fundamental norms of the sentencing process." ***Commonwealth v. Conte***, 198 A.3d 1169, 1174 (Pa. Super. 2018) (citation omitted), *appeal denied*, 206 A.3d 1029 (Pa. 2019). Here, Appellant contends his sentence is "unduly harsh" because the court "ignored [his] serious physical health issues[.]" Appellant's Amended Brief at 13. This raises a substantial question for our review. ***See Commonwealth v. Swope***, 123 A.3d 333, 339 (Pa. Super. 2015) ("[A]n excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question.") (citation omitted). Furthermore, when the sentence is imposed within the guideline ranges, "we look to whether the appellant has forwarded a plausible argument that the sentence . . . is clearly unreasonable." ***Id.*** at 340 (citation omitted).

Here, Appellant argues the sentencing court abused its discretion in failing to consider mitigating factors, "including Appellant's poor health which requires him to attend frequent doctor appointments and to undergo dialysis." Appellant's Amended Brief at 18. Appellant argues he was diagnosed with nephrotic syndrome, a disease that "impairs [A]ppellant's kidney function, forcing him to attend dialysis treatments three days a week, for a period of four hours[ and weakens] his immune system, placing him at a greater risk of infection[.]" ***Id.*** at 19. Due to his conditions, Appellant sees a "pulmonologist and cardiologist [and] is required to wear an oxygen mask." ***Id.*** Appellant argues that because of these "extensive medical issues," his sentence was "unduly harsh and an abuse of the [s]entencing [c]ourt's discretion." ***Id.***

Preliminarily, we note:

Sentencing is the responsibility of the trial court and we will not disturb the sentence unless there is manifest abuse of discretion. To establish a manifest abuse of discretion, the appellant must show a misapplication of the law, or partiality, prejudice, bias, or ill will that led to the unreasonable decision.

***Commonwealth v. Knox***, 219 A.3d 186, 199 (Pa. Super. 2019) (citations omitted), *appeal denied*, 228 A.3d 256 (Pa. 2020).

Upon our review of the record, we detect no basis to conclude the sentence imposed by the trial court constituted an abuse of discretion. The court considered the guidelines on each conviction and imposed each sentence to run concurrently. N.T. Sentencing, at 21-23. As the court noted, it could have ordered Appellant's sentences to run consecutively on all four counts. Trial Ct. Op. at 3.

Furthermore, the trial court ordered a presentence investigation report for Appellant. ***See Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super 2010) ("Where the sentencing court had the benefit of a presentence investigation report[,] we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors") (citations and punctuation omitted); N.T. Sentencing, at 3. Moreover, the trial court did consider Appellant's extensive health issues when fashioning his sentence. The court stated:

Being aware of [Appellant's] medical condition, I'm going to request that the Pennsylvania Department of Corrections be contacted prior to him being picked up by them, and instead of

- 17 -

being transported to Camp Hill SCI for diagnostic evaluation, that he be transported to SCI Laurel Highlands in Somerset, Pennsylvania, which is the hospital which the Department of Corrections operates for people, specifically defendants who are ill in any way.

N.T. Sentencing at 21. This Court will not conclude a sentence is unduly harsh merely because the defendant has a medical condition, especially when the trial court ensured the defendant would be cared for appropriately. Due to these facts, we conclude the sentence is not "clearly unreasonable[ ]" and, thus, no relief is due. *See Swope*, 123 A.3d at 340

Because we conclude the Commonwealth's evidence was sufficient, Appellant failed to show the jury's verdict was against the weight of the evidence, and the trial court considered appropriate factors in fashioning Appellant's sentence, no relief is due. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/16/2021